IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Neil Lutz, | ) |
| | ) |
|     *Plaintiff*, | ) |
| | ) Case No. 15 CV 50290 |
| v. | ) |
| | ) Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     *Defendant*. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Neil Lutz brings this action under 42 U.S.C. § 405(g), seeking a remand of the decision denying him social security disability benefits. For the reasons set forth below, the decision is remanded.

### I. BACKGROUND[1]

On June 20, 2011, Plaintiff filed applications for disability insurance benefits and supplemental security income. Plaintiff alleged a disability beginning on September 1, 2008, because of chronic neck and back problems and depression and anxiety.[2] R. 220, 228, 270.

In 2007, Plaintiff reported to his primary care physician that he was having headaches on a daily basis, noting that he was in a car accident when he was 16 years old and injured his neck. R. 363. An MRI revealed disk bulging and herniation. R. 363. Plaintiff was prescribed Flexeril for muscle spasms and Vicodin for his pain. R. 364.

In September 2008, Plaintiff began treating with a spinal surgeon, Dr. Christopher Silva, due to complaints of back and left leg pain. R. 413. He was diagnosed with a disk herniation at

---

[1] The following facts are only an overview of the medical evidence provided in the administrative record.
[2] Plaintiff's appeal focuses on only his neck and back-related problems, so the Court will not address his mental health issues.

1

L5-S1 with radiculopathy.[3] R. 414. On September 17, 2008, he received an epidural injection, but it did not relieve his back pain. R. 423. Subsequently, he underwent a total of three back surgeries and a neck surgery to relieve his pain.

The first surgery, a L5-S1 laminotomy with partial discectomy, occurred on September 29, 2008. R. 431. Following surgery, Plaintiff reported that his leg pain was gone, and he returned to his job as a welder. R. 390, 412. Plaintiff continued to work through the end of December 2008, when he reinjured his back wrestling with his son. R. 384. Plaintiff went to the emergency room and was given Flexeril and Vicodin for his pain. R. 384. An MRI from January 2009 revealed small recurrent disk herniation at L5-S1. R. 405. Plaintiff was given a Medrol dosepak and was told to get an epidural injection. R. 405. His doctor recommended surgery if Plaintiff did not improve with this treatment. R. 405.

In January 2010, Plaintiff was still taking Flexeril and Vicodin for his pain. R. 351. He also started seeing a new doctor, Dr. Kevin Draxinger, after he fell and experienced pain radiating down his left leg that left him barely able to walk. R. 351. Due to continued disc herniation at L5-S1 and some foraminal narrowing at L4-5, Plaintiff underwent a second back surgery on January 18, 2010. R. 352, 429. Dr. Draxinger performed an L5-S1 revision discectomy. R. 352, 429.

In the weeks following his surgery, Plaintiff still complained of pain and began taking Percocet. R. 353. By February 2010, Plaintiff reported feeling somewhat better, taking only 3 Percocet a day. R. 354. In March 2010, Plaintiff still had periodic "stinging in his leg," and began using Vicodin instead of Percocet. R. 355, 365. Plaintiff also reported ongoing problems with his neck, which caused "headaches fairly often." R. 355. A cervical MRI revealed a "2-

---

[3] Radiculopathy is a disorder of the spinal nerve roots. STEDMAN'S MEDICAL DICTIONARY 1622 (28th ed. 2006).

2

level disk bulging and herniation," which was consistent with the cervical MRI taken in 2007. R. 356. Plaintiff's doctor discussed the possible need for cervical disk replacement surgery. R. 356.

In April 2010, Plaintiff returned to see Dr. Silva, complaining of leg and back pain and weakness despite his most recent surgery. R. 396-98. Dr. Silva diagnosed Plaintiff with recurrent disk herniation at L5-S1 with severe radiculopathy and disk herniation at L4-5 with radiculopathy. R. 393, 425. As a result, Plaintiff had back surgery a third time on May 20, 2010. R. 424. Dr. Silva performed a lumbar fusion at L4 to the sacrum and L4-S1 laminectomy. R. 424. Following surgery, Plaintiff still had pain in his back and left leg, and he was prescribed Norco and Flexeril. R. 381-82. In June and July 2010, Plaintiff still had back and leg pain and complained of side-effects from his continued use of narcotic pain medication. R. 366, 389. Plaintiff's MRI from July 2010 showed no disk herniation. R. 422.

On August 18, 2010, Plaintiff followed up with Dr. Silva, complaining of left leg pain, despite the use of pain medication. R. 388. Dr. Silva's examination revealed that Plaintiff had some tenderness in his back and diminished sensation in his calf, but had normal motor strength and "no residual stenosis." R. 388. In September 2010, Plaintiff was limiting his use of Vicodin by using Gabapentin, but complained that it did not help with his chronic back pain. R. 367. In October 2010, Plaintiff reported treating at Rosecrance to eliminate his dependence on narcotic pain medication and his desire to stay off narcotics. R. 368. Nevertheless, by September 2011, Plaintiff again was dependent on Norco for pain control. R. 507.

In June 2011, Dr. Silva evaluated Plaintiff's neck pain. R. 387. An MRI revealed "[c]ervical degenerative disk disease at C3-4 and C4-5 with minimal and episodic radiculopathy." R. 387. Dr. Silva prescribed physical therapy, noting that if this did not work,

3

Plaintiff would be a candidate for cervical epidural injections. R. 387. In September 2011, Dr. Silva noted that Plaintiff may need treatment for his neck beyond injections, but that Plaintiff's lumbar spine should be dealt with first. R. 542. Dr. Silver opined that there was nothing else that could be done for Plaintiff's back, but ordered a CT scan of his lumbar spine to evaluate healing of the prior surgery. R. 542. The CT scan revealed pseudoarthrosis[4] at L5-S1. R. 539-40. In November 2011, Dr. Silva opined that this may require surgical reconstruction. R. 540. Plaintiff also underwent an EMG, which was normal, except for "some evidence of polyneuropathy."[5] R. 539, 543.

On October 3, 2011, Plaintiff received a cervical injection for his neck pain. R. 588. Plaintiff did not get relief from the first injection, so he received a second one on October 24, 2011. R. 587. In November 2011, Dr. Silva informed Plaintiff that his neck would require a fusion from C3-5, but Plaintiff would have to stop smoking first. R. 539-40. By the end of November 2011, Plaintiff quit smoking and was ready to proceed with surgery on his neck, but ultimately cancelled surgery in January 2012 because he was "unemployed and unable to work." R. 566-67.

In February 2012, Plaintiff went to the emergency room complaining of headaches. R. 654. Plaintiff was given Norco at the hospital to relieve his pain. R. 667. In April 2012, Plaintiff again quit smoking and his surgery was rescheduled for June 2012. R. 565-66. However, due to "transportation difficulties" Plaintiff again canceled the surgery. R. 564. In August 2012, Plaintiff returned to the emergency room complaining of headaches. R. 697. He received a prescription for Ibuprofen and Norco. R. 697. In September 2013, Plaintiff went to

---

[4] Pseudoarthrosis is a new, false joint arising at the site of an ununited fracture. STEDMAN'S MEDICAL DICTIONARY 1587-88 (28th ed. 2006)
[5] Polyneuropahty is a generalized disorder of the peripheral nerves. STEDMAN'S MEDICAL DICTIONARY 1536 (28th ed. 2006).

the emergency room complaining of back pain after he fell down the stairs. R. 775, 777. He again received a prescription for Norco. R. 777.

In December 2013, Plaintiff returned to see Dr. Silva for his neck pain. Dr. Silva reported that Plaintiff had "severe neck pain with radiation to the right shoulder, arm and forearm" despite treatment including physical therapy, steroid injections, activity modification, and oral medications. R. 876. Plaintiff "just tried to deal with the symptoms." R. 876. Plaintiff also reported continued back and leg pain and weakness. R. 878. Dr. Silva noted that he previously recommended neck surgery, but Plaintiff was smoking at the time and needed to quit. R. 876.

On January 23, 2014, Plaintiff underwent a cervical discectomy and fusion from C3-5. R. 887. Following surgery, Plaintiff's arm pain and headaches were resolved, but he still had neck pain. R. 915-16, 920. Plaintiff also continued to have back and leg pain. R. 915. In March and April 2014, Plaintiff was still using Norco for his neck pain, and he was also prescribed physical therapy. R. 345, 918, 920. For his back pain, Plaintiff was prescribed Tramadol, Lyrica and epidural injections. R. 918-19. Based on a CT scan from March 2014, Dr. Silva was unsure if Plaintiff had pseudoarthrosis or a solid fusion at L5-S1. R. 919. He could not be certain without performing a risky surgical procedure that he did not recommend. R. 919.

On May 13, 2014, a hearing was held before an administrative law judge ("ALJ"). R. 40-98. Plaintiff was then 48 years old. Plaintiff testified that he used to be a heavy steel welder, but he stopped working shortly after his first back surgery in 2008. R. 47. Plaintiff also worked part-time as a dishwasher in a restaurant from 2010 until 2011, when the restaurant burned down. R. 43. However, Plaintiff testified that he had trouble standing at this job due to his back and leg pain. R. 48. Plaintiff also had trouble sitting for longer than 20-30 minutes at a time. R. 52.

5

Plaintiff further testified that following his neck surgery, his headaches and arm pain got better, but he still had pain in his shoulders. R. 52, 62. Plaintiff was taking Tramadol to relieve his pain, and he was referred to pain management and physical therapy a few weeks before the hearing. R. 52, 55-56. It was also recommended that Plaintiff receive epidural shots for his back pain. R. 52-53.

On June 6, 2014, the ALJ issued his opinion, finding Plaintiff not disabled. R. 10-23. The ALJ found that Plaintiff had the following severe impairments: cervical spondylosis with status post January 2014 fusion; lumbar stenosis, facet arthropathy[6] and lumbar disc herniation with status post multiple lumbar revision procedure and fusion; depression; and anxiety. R. 13. The ALJ determined that Plaintiff's impairments did not meet or medically equal the criteria for Listing 1.04(A). R. 14. The ALJ concluded that Plaintiff had the Residual Functional Capacity ("RFC") to perform sedentary work with certain restrictions. R. 16.

## II. DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial

---

[6] Arthropathy is any disease affecting a joint. STEDMAN'S MEDICAL DICTIONARY 161 (28th ed. 2006).

evidence).  A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.  *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).  Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).  Moreover, federal courts cannot build the logical bridge on behalf of the ALJ.  *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

On appeal, Plaintiff argues that the ALJ erred in determining his RFC and whether he met or equaled Listing 1.04(A).  Specifically, Plaintiff argues that the ALJ inconsistently relied on the medical expert's opinion, failed to properly analyze the requirements under the listing, and incorrectly assessed his credibility.  After reviewing the ALJ's decision in this case, the Court agrees that remand is warranted.

At the hearing, medical expert Dr. Ashok Jilhewar testified about Plaintiff's back and neck problems.  He found that Plaintiff's back problems equaled Listing 1.04(A) for disorders of the spine from the time of his first back surgery on September 29, 2008, until his recovery after his third back surgery on August 18, 2010.  R. 69, 75.  Specifically, Dr. Jilhewar found that after August 18, 2010, Plaintiff had a "decrease in symptoms" such that his motor strength was normal, there was no documentation of neurological deficits and there was no course of pain management or extended physical therapy.  R. 75-76.  Dr. Jilhewar also concluded that after this date, Plaintiff could perform sedentary work with certain restrictions.  R. 77.

The first hurdle with the expert's testimony, as Plaintiff points out, is that several portions of Dr. Jilhewar's testimony are unclear due to numerous inaudible remarks, contradictory statements, confusing or incorrect citations to the medical record and an unclear distinction

between a recitation of the medical record and opinions about those records. For example, Dr. Jilhewar largely discounted Plaintiff's complaints of back and leg pain because there were no documented neurological deficits, but when describing Plaintiff's RFC he confusingly claims there were neurological deficits. R. 77. Dr. Jilhewar also questioned Dr. Silva's diagnosis of pseudoarthrosis in the lumbar spine because it was not supported by an MRI, CT scan or other neurological evaluation. R. 73. He referenced Exhibit 13F page 6, however, that medical record appears not to be the medical record to which Dr. Jilhewar intended to reference. *See* R. 549-52 (Exhibit 13F is the evaluation from the state-agency physicians). Dr. Jilhewar appears to have intended to reference Exhibit 30F, which contains a medical record from a doctor visit in March 2014, noting that Plaintiff had pseudoarthrosis. R. 920. However, the exhibit also contains records from later visits that reveal Plaintiff *did* have a CT scan, following which Dr. Silva determined that pseudoarthrosis was not likely, but admitted he could not be certain without performing a risky surgical procedure that he did not recommend. R. 919. Instead of mentioning this information and how it could relate to Plaintiff's continued reports of pain, Dr. Jilhewar instead went straight into testimony about Plaintiff's neck and non-severe impairments. R. 73.

Additionally, Dr. Jilhewar referenced a "first period" when Plaintiff equaled Listing 1.04(A). R. 75. He also mentioned a "second period" beginning on June 29, 2011, when Dr. Silva evaluated Plaintiff's neck pain. R. 65. He commented at length about Plaintiff's medical records relating to his neck, including prior MRIs from 2010 revealing degenerative disc disease, but never opined whether his neck impairment met or equaled any listing or whether the combined effect of Plaintiff's back and neck impairments met or equaled a listing. R. 70-72, 81-84.

8

Along with some confusion over Dr. Jilhewar's testimony, the Court is similarly confused by the ALJ's evaluation of Dr. Jilhewar's opinions. The ALJ ultimately determined that Plaintiff did not meet or equal Listing 1.04(A), but in doing so, gave Dr. Jilhewar's listing equivalency analysis[7] "limited weight." R. 14. He also gave Dr. Jilhewar's RFC determination "minimal weight", despite similarly finding Plaintiff capable of sedentary work. R. 15. The Court finds the ALJ's evaluation of this opinion and the RFC determination unsupported and inconsistent.

Initially, the ALJ discounted Dr. Jilhewar's opinions by giving them "limited" and "minimal" weight without evaluating any checklist factors as required under the regulations. *See* 20 C.F.R. § 404.1527(e)(2)(iii). The ALJ attempted to address the supportability of Dr. Jilhewar's listing opinion, finding that "the conclusion is medically-inconsistent with the program requirements of 1.002b1 and 1.002b2," namely an inability to ambulate effectively. R. 14; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b). However, Listing 1.04(A) does not have such a requirement. The Listing describes disorders of the spine and requires a claimant to show "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A). Subsection A, which the ALJ specifically considered, does *not* require an inability to ambulate effectively. Thus, the ALJ likely confused the requirements of Listing 1.04(A) with those in Listings 1.02(A) or 1.04(C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.02(A), 1.04(C) (requiring an inability to ambulate effectively).

---

[7] The ALJ incorrectly recited the time period Dr. Jilhewar believed Plaintiff met the listing, stating that it began on the date of his alleged onset, September 1, 2008, instead of the date of his first back surgery, September 29, 2008. R. 14.

9

The Commissioner argues that this error is harmless because Plaintiff did not medically meet Listing 1.04(A). Defendant's Memorandum at 9, Dkt. 14. The Commissioner points to the ALJ's "well-supported reasoning – based on [Plaintiff's] work activity." Defendant's Memorandum at 9, Dkt. 14. The Court does not find the ALJ's reasoning well supported. It is true that Plaintiff returned to his welding job for three months in 2008 after his first surgery and also worked part-time for six months in 2011 as a dishwasher following his third surgery. However, the ALJ seemed to reference Plaintiff's work activity only to highlight the fact that "[b]oth jobs [] require effective ambulation, which is a specific program requirement for Listing 1.04A severity." R. 14. The Court cannot look past the ALJ's flawed reliance on a nonexistent listing requirement to evaluate Plaintiff's impairments or discredit Dr. Jilhewar's opinion. *See M.N. ex rel. Rodriguez v. Colvin*, No. 12 C 9367, 2014 U.S. Dist. LEXIS 55261, at *14 (N.D. Ill. Apr. 22, 2014) (finding a reliance on improper elements of a listing reversible error). Even without reliance on an ability to ambulate, the ALJ seemed to discredit Dr. Jilhewar almost entirely based on Plaintiff's work history, but failed to explain how two brief periods of employment would undermine an alleged disability spanning over five years. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citations and internal quotation marks omitted) ("Having a job is not necessarily inconsistent with a claim of disability; the claimant may have a careless or indulgent employer or be working beyond his capacity out of desperation."). Additionally, Dr. Jilhewar reviewed the medical records and heard Plaintiff's testimony about his work history, yet still opined that Plaintiff's back impairment met Listing 1.04(A) from 2008 through 2010. Despite this, the ALJ neglected to address his concerns about Plaintiff's work history with Dr. Jilhewar at the hearing.

Even the ALJ's statement that he "infers that surgery effectively restored functioning within the interval under adjudication" is insufficient to support his listing conclusion because Plaintiff had 4 surgeries over the course of 5 years. R. 15. Assuming the ALJ found that all 4 of Plaintiff's surgeries sufficiently restored his functioning, the ALJ provided no explanation. The ALJ is free to disregard findings reserved to the Commissioner, such as whether Plaintiff met or equaled a listing, but the ALJ must provide legitimate reasons for his decision. *See Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) (finding that the ALJ should have considered the claimant's efforts to continue working while experiencing significant pain and undergoing numerous surgeries and treatment).

The ALJ outlined some of the medical records relating to Plaintiff's surgeries, noting that after August 2010, Plaintiff did not return to see Dr. Silva until June 2011 for his neck. The ALJ inferred from this that Plaintiff's "lumbar issues substantial [sic] had become quiescent as a result of surgery and post-operative intervention." R. 18. However, the ALJ ignores Plaintiff's complaints of back pain to his primary care physician and his use of and struggle with narcotic pain medications in the months following August 2010. R. 367-68. Even when Plaintiff began treating for his neck in June 2011, his medical records through April 2014 reveal that he still complained of back pain and was taking pain medications and epidural shots to relieve his pain. R. 540-42, 587, 775, 777, 878, 918-19. The ALJ also failed to discuss Plaintiff's previous unsuccessful attempts at surgery.

The ALJ also noted that Plaintiff waited 1 ¼ years to have neck surgery, "implying that neck and back symptoms were not intrusive to the extent or frequency asserted." R. 19. Although the lack of treatment is a significant factor in an ALJ's decision, the Court takes issue with the fact that the ALJ failed to address this issue with Plaintiff at the hearing. An ALJ is

11

required to do so before construing Plaintiff's gaps in treatment against him. *See* SSR 16-3p; *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment . . . can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). The ALJ merely pointed out that Dr. Silva recommended surgery in 2011, but Plaintiff had to quit smoking. The ALJ failed to discuss that Plaintiff subsequently quit smoking, but cancelled twice because he was unemployed and later due to transportation difficulties. During this period, Plaintiff was also taking narcotics to relieve his pain, despite previous struggles with addiction. Even Dr. Silva noted that Plaintiff tried to deal with his symptoms because other treatments failed.

Plaintiff also testified at the hearing that he still suffered from neck, back and leg pain. Even the consultative examiner's report revealed that Plaintiff had back and neck pain when examined. R. 507. Such complaints of pain cannot simply be dismissed. *See* 20 C.F.R. § 404.1529(c)(2) (stating that complaints of pain cannot be disregarded solely because they are not supported by objective medical evidence); *Stark*, 813 F.3d at 688. The ALJ found Plaintiff's alleged pain tolerable because Dr. Silva mentioned the need for pain management in September 2011, but never referred Plaintiff to pain management. R. 18. The ALJ also stated "[t]he fact that the claimant has not received physical therapy or required pain management since January 2014, a four-month postoperative interval, tends to imply that he had not deteriorated and was stabilizing." R. 19. Yet, the ALJ failed to mention Plaintiff's testimony that he was referred to physical therapy and pain management shortly before the hearing. This is significant because Dr. Jilhewar found that Plaintiff would probably continue to equal Listing 1.04(A) if he was in pain management. R. 76.

Turning to the RFC determination, the ALJ also relied on Plaintiff's work history and ability to ambulate to discount Dr. Jilhewar's determination that Plaintiff was limited to sedentary work after August 18, 2010. R. 19. The ALJ assigned Dr. Jilhewar's RFC determination "minimal weight" and confusingly stated that he would "accept that conclusion as 'a floor' for inferring maximum residual functional capacity." R. 15. The Court does not comprehend how a RFC determination, which represents the most a claimant can do despite his limitations, could ever be "a floor" for such a determination. *See* Social Security Ruling 96-8p.

Nevertheless, the Court is more concerned with the ALJ's reasoning. The ALJ ultimately determined that Plaintiff had the capacity to perform sedentary work from 2008 through 2014. In making this decision, the ALJ originally questioned Dr. Jilhewar's conclusion that Plaintiff had the capacity to perform only sedentary work after 2010, pointing to Plaintiff's part-time dishwashing job in 2011. R. 14. Despite this, the ALJ later finds "substantial support" for the determination that Plaintiff can perform only sedentary work after 2010 without any explanation for the previous contradiction. R. 19.

As to Plaintiff's RFC before 2010, the ALJ failed to explain how he determined the RFC, other than generally citing to Plaintiff's ability to ambulate and his work history. The Commissioner attempts to explain the RFC determination by filing in the blanks of what the ALJ could reasonably have concluded. Defendant's Memorandum at 6, Dkt. 14. However, the bases for the ALJ's reasoning should be clear from his decision and not require the Court to piece it together. *Eichstadt*, 534 F.3d at 665-66 (stating that the ALJ must explain his analysis of the evidence with enough detail to permit meaningful review). Moreover, it is difficult to find that the decision is supported by substantial evidence when the ALJ has employed a piecemeal-based evaluation of the evidence and opinions in the record. *See Augustyniak v. Colvin*, No. 2:14-CV-

229-JEM, 2015 U.S. Dist. LEXIS 116658, at *15-16 (N.D. Ind. Sept. 1, 2015) (remanding for a new RFC where the ALJ inconsistently considered the state consultants' opinions).

Therefore, the Court finds that the ALJ's decision lacks support and should be remanded for further consideration. On remand, the ALJ should also take the opportunity to consider Plaintiff's subjective symptoms in light of the Social Security Administration's new guidance in Social Security Ruling 16-3p. SSR 16-3p (eliminating the term "credibility" to "clarify that subjective symptom evaluation is not an examination of the individual's character" and outlining a two-step process to evaluate impairment-related symptoms). Moreover, the ALJ should ensure to thoroughly explain his findings. *See* SSR 16-3p ("We may or may not find an individual's symptoms and related limitations consistent with the evidence in his or her record. We will explain which of an individual's symptoms we found consistent or inconsistent with the evidence in his or her record and how our evaluation of the individual's symptoms led to our conclusions."). In remanding, this Court is not suggesting that Plaintiff meets or equals the requirements of Listing 1.04(A) or that Plaintiff is not capable of performing sedentary work, but the ALJ must clearly explain the reasoning for his conclusions.

## IV. CONCLUSION

For the reasons stated in this opinion, Plaintiff's motion for summary judgment (Dkt. 13) is granted, and the Commissioner's motion (Dkt. 14) is denied. The decision of the ALJ is remanded for further proceedings consistent with this opinion.

Date: December 5, 2016           By: _____
                                     Iain D. Johnston
                                     United States Magistrate Judge

14